Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S Sepulveda Suite 1121
Los Angeles, CA 90034
T: 562-534-5907
E: victor@almeidalawgroup.com

Arturo Peña Miranda (SBN 325108)
**STERLINGTON, PLLC**
228 Park Avenue South, No. 97956
New York, New York 10003
T: (212) 433-2993
E: arturo.pena@sterlingtonlaw.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

WARREN PANDISCIA, on behalf of himself and all others similarly situated,

*Plaintiff*,

v.

TWITCH INTERACTIVE, INC. and AMAZON.COM, INC.,

*Defendants.*

Case No. ____________________

**CLASS ACTION COMPLAINT**

**1. BREACH OF IMPLIED CONTRACT AND OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**

**2. UNJUST ENRICHMENT;**

**3. BREACH OF EXPRESS CONTRACT;**

**4. VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ*.**

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff Warren Pandiscia, on behalf of himself and all others similarly situated, brings this action against Defendant Twitch Interactive, Inc. ("Twitch"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## INTRODUCTION

1. This is a nationwide class action arising from Defendants unlawfully using millions of videos from Twitch's online video streaming and viewing platform, www.twitch.tv, in order to feed, train, improve, and commercialize Defendants' large-scale generative artificial intelligence ("AI") models and products.

2. Twitch is the world`s leading live video platform and community for gamers.

3. In February 2014, The Wall Street Journal ranked Twitch as the 4th largest website in terms of peak internet traffic in the U.S., fortifying the brand as an entertainment industry leader and the epicenter of social video for gamers.[1]

4. Amazon.com, Inc. ("Amazon") acquired Twitch in 2014 for approximately $970 million in cash.[2]

5. In July 2014 more than 55 million unique visitors viewed more than 15 billion minutes of content on Twitch, produced by more than 1 million broadcasters, including individual gamers, pro players, publishers, developers, media outlets,

---

[1] The Wall Street Journal, *Amazon to Buy Video Site Twitch for $970 Million* (Aug. 26, 2014), https://www.wsj.com/articles/amazon-to-buy-video-site-twitch-for-more-than-1-billion-1408988885

[2] AmazonNews, *Amazon.com to Acquire Twitch* (Aug. 25, 2014), https://press.aboutamazon.com/2014/8/amazon-com-to-acquire-twitch

conventions and stadium-filling esports organizations.[3]

6. By 2026, Twitch had over 240 million monthly active users, with roughly 26 to 30 million people visiting the platform every single day.

7. About 3.2 million to 6.9 million unique creators go live on the platform each month, and average concurrent (simultaneous) viewership hovers around 2.1 to 2.37 million users at any given moment.

8. On or about August 12, 2026, Twitch has confirmed that its parent company, Amazon, uses the platform's content for AI training, and users will need to opt out of the program if they don't like it.[4]

9. Twitch's Chief Product Officer Mike Minton "defended" the decision to opt in all accounts automatically during a live Q&A session, stating, "If it was opt-in, nobody would opt in. That's honestly the answer."[5]

10. The default configuration allows Amazon to collect live broadcasts, recorded videos, clips, chat logs, channel imagery, and text.[6]

11. To stop data collection, streamers must go to their account settings, select the Security and Privacy section, and disable the option labeled "Training for Generative AI."

12. The policy triggered immediate backlash across the creator community on Twitch, with broadcasters voicing frustration over automatic enrollment into AI dataset collection, considering many users and community create anti-AI content.[7]

---

[3] *Id.*

[4] PCMag, *Amazon is Using Twitch Content for AI Training: Here's How You Can Opt Out* (Aug. 13, 2026), https://www.pcmag.com/news/amazon-is-using-twitch-content-for-ai-training-heres-how-you-can-opt-out

[5] *Id.*

[6] The American Bazaar, *Amazon automatically trains AI models on Twitch channel content by default* (August 13, 2026), https://americanbazaaronline.com/2026/08/13/amazon-automatically-trains-ai-models-on-twitch-486342/.

[7] *Id.*

13. Upon information and good faith belief, Defendants have been mining creators' content on Twitch to train AI without creators' knowledge or consent since as far back as 2024, prior to updating Twitch settings to allow creators to opt out of the collection.

14. When users questioned if their content is already being used to train AI without their knowledge, Minton responded as follows: "I don't actually know the answer to that question because I don't know what Amazon has done in terms of model training and what they've used and not used."[8]

15. Twitch's Terms of Service, in effect since March 2024, have stipulated that users grant Twitch and its sublicensees the right to use, reproduce, modify, adapt, distribute, and create derivative works from their content. However, until now, they have not explicitly stated that such materials could be used to train generative AI models.[9]

16. Defendants know that the Twitch community of streamers is largely opposed to the use of generative AI, since the most prevalent generative AI products are trained on books, images, videos, and other materials scraped from the internet without consent.[10]

17. Even Twitch's approach to breaking this news shows that Defendants are bracing for backlash. Instead of telling the community that Amazon is training on Twitch users' content, Twitch framed the announcement as "[adding] a setting that lets you opt out of having your channel content used to train generative AI content models across Amazon."[11]

---

[8] *Id.*

[9] *See, e.g.*, https://legal.twitch.com/es-mx/legal/terms-of-service/?utm_source=chatgpt.com

[10] https://techcrunch.com/2026/08/12/amazon-will-train-on-twitch-streamers-content-by-default-unless-they-opt-out/

[11] *Id.*

18. Twitch stream recordings are incredibly valuable for Defendants, offering thousands of hours of audio and video content to help train AI models.

19. Rather than seek permission or pay a fair price for the audiovisual content streamed on Twitch, Defendants harvested content creators' streams at scale without consent or compensation.

20. Defendants' actions were not only unlawful, but an unconscionable attack on the community of content creators whose content is used to fuel the multi-trillion-dollar generative AI industry without any compensation.

21. Content creators such as Plaintiff and the Class Members will never be able to claw back the intellectual property unlawfully copied and used by Defendants to train Amazon's generative AI. Once AI ingests content, that content is stored in its neural network, and not capable of deletion or retraction. Defendants' actions constitute abuse and exploitation of content creators' work for Defendants' profit.

22. Twitch streams and videos are not registered with the U.S. Copyright Office. That lack of registration, however, does not render them valueless or leave them unprotected. Content creators invest time, skill, and resources into producing their works, which are exploited by Defendants for their own gain without authorization.

23. An essential component of Defendants' business model—powering AI features and services with large-scale training data—includes the mass acquisition and ingestion of creators' content captured on the Twitch platform.

24. Defendants have benefitted substantially from their infringement of Plaintiff's and Class Members' video and streaming content through Defendant Amazon's training of its generative AI products.

25. Plaintiff and the Class Members whom Plaintiff seeks to represent are content creators who share their audiovisual content on twitch.tv. On information and belief, the audiovisual content of Class Members was among the content used by

Defendants to train Amazon's generative AI models.

26. Plaintiff brings this class action on behalf of himself and on behalf of a nationwide class of Twitch content creators whose works were captured, ingested, and trained on without authorization.

**JURISDICTION AND VENUE**

27. *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are well over 100 putative Class members, and minimal diversity exists because one or more putative Class members are citizens of a different state than at least one Defendant.

28. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant Twitch because Twitch maintains its principal place of business in the state of California—specifically, in this District. This Court has personal jurisdiction over Defendant Amazon because Defendant conducts business in this District, and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

29. *Venue.* Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant is located in this District, Defendant conducts business in this District, and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

*Plaintiff*

30. Plaintiff Warren Pandiscia is a citizen of the State of Connecticut residing in Fairfield County.

*Defendant Twitch Integrated, Inc.*

31. Defendant is a Delaware corporation with its headquarters located at

350 Bush St., 2d Floor, San Francisco, California, 94104.

*Defendant Amazon.com, Inc.*

32. Defendant is a Delaware corporation with its headquarters located at 410 Terry Avenue North, Seattle, WA 98109.

## **FACTUAL BACKGROUND**

### A. **Amazon AI Products**

33. Defendant Amazon operates several large-scale generative AI models and products, including its commercialized text-to-video model "Nova Reel" and the broader family of generative AI models, generative video understanding architectures, and AI services that Defendant has developed, deployed, and monetized across its for-profit enterprise (collectively, "Amazon's AI Products").

34. One of such products is Nova Reel, an AI system designed by Defendant Amazon to generate video output from text and image input. This "text-to-video" and "image-to-video" system is intended to allow consumers to generate videos using text and image prompts.

35. Nova Reel is a text-to-video AI model conceived and marketed as Amazon's dedicated video generation platform. Amazon Nova Reel is commercially available through Amazon Bedrock, Amazon's managed AI services platform, where Amazon charges enterprise customers per second of video generated. Amazon Nova Reel was developed by Amazon AGI, the artificial general intelligence division of Amazon.com, Inc., and was publicly launched in December 2024 as part of the Amazon Nova family of commercial foundation models.

36. The technology Defendant Amazon has and continues to develop is now a core feature of the commercial AI products and services Amazon offers to its customers. Through Amazon Bedrock and related offerings, Defendant's enterprise customers can leverage this capability, which turns text or a static image into a video, for which Amazon charges on a per-use basis.

37. By capturing Twitch creators' content, Defendants used Plaintiff's and Class Members' intellectual property for their own commercial gain.

38. Rather than seek permission or pay a fair price for the audiovisual content streamed on Twitch, Defendants harvested content creators' work product without authorization or compensation.

39. Amazon's appetite for video training data at massive scale is documented in its own publications. In a March 2024 paper, *VidLA: Video-Language Alignment at Scale*, Amazon researchers disclosed that Amazon "utilize[d] 20 million videos from the YT-Temporal-1B [] dataset"—a publicly indexed collection of YouTube video identifiers—to construct a proprietary training corpus of approximately 800 million video clips, which Amazon named YT-VidLA-800M.[12]

40. Amazon's published documentation for Nova Reel likewise states that Amazon "pre-train[s] the [foundation model] using curated data from a variety of sources, including licensed and proprietary data, open-source datasets, and publicly available data where appropriate."[13] On information and belief, content captured from Twitch is among the so-called "proprietary data" used to pre-train, improve, and commercialize Amazon's AI Products, including Nova Reel and its successors.

41. Amazon has also acquired video training data from platforms it does not own. To train Nova Reel, Amazon obtained millions of YouTube videos for its AI training by deploying automated tools alleged to circumvent YouTube's technological protection measures, including technology designed to defeat

[12] Mamshad Nayeem Rizve, Fan Fei, Jayakrishnan Unnikrishnan, Son Tran, Benjamin Z. Yao, Belinda Zeng, Mubarak Shah & Trishul Chilimbi, *VidLA: Video-Language Alignment at Scale*, arXiv:2403.14870 (Mar. 21, 2024), https://arxiv.org/pdf/2403.14870.

[13] Amazon Web Services, *Amazon Nova Reel AI Service Card*, https://docs.aws.amazon.com/ai/responsible-ai/nova-reel/overview.html (last visited Aug. 19, 2026).

YouTube's blocking, verification, and access-token systems.[14] At Twitch, Defendants controlled the platform and held the content, and simply took it—enrolling every creator by default and disclosing the program only after the fact.

**B. Plaintiff and Class Members Create and Control Their Channels on Twitch**

42. Plaintiff and the Class Members are independent content creators of audiovisual content.

43. Plaintiff and the Class Members create video content and stream their content onto Twitch's channel sharing platform.

44. While Twitch does not offer a dedicated feature for private channels, streamers can set their channels to subscriber-only mode, allowing only paying subscribers to view the stream.

45. Twitch offers an option to creators to save their streams for a certain period of time (for example, as videos on demand), but does not offer an official way to download someone else's videos.

46. Given these restrictions, content creators, including Plaintiff and Class Members, expect that their work product will not be copied at scale without consent.

**C. Defendants' Actions Enriched Them and Caused Harm to Plaintiff and Class Members**

47. Defendant Amazon requires significant amounts of data to feed, train, improve, and commercialize its generative AI products including Nova Reel, the text-to-video model created, owned and controlled by Amazon.

48. Defendants accessed Plaintiff's and Class Members' audiovisual content from Twitch for use in their training data for Amazon AI products, without

[14] First Am. Class Action Compl. ¶¶ 80-84, *Ted Entertainment, Inc. v. Amazon.com, Inc.*, No. 2:26-cv-01134-JNW (W.D. Wash. June 30, 2026), ECF No. 13.

proper authorization.

49. Amazon AI projects are not research tools or isolated projects; they are Defendant's attempt to commercialize foundational text-to-video AI models.

50. Because Amazon AI products are commercialized, Amazon had an overwhelming incentive to acquire training data on an unprecedented scale. Rather than negotiate for lawful licenses or seek permission, Defendants accessed the Twitch streams and videos to utilize them as a massive dataset necessary to fuel Amazon's AI products.

51. At no time did Defendants seek or obtain Plaintiff's or Class Members' authorization to access and use the content Defendants used to train Amazon's generative AI models.

52. At no time did Defendants compensate Plaintiff or the Class Members for the access, copying, ingestion, and use of their Twitch content in AI training and related workflows.

53. Plaintiff and Class Members used Twitch with the expectation that their streaming and video content would not be subject to unauthorized accessing and downloading, bulk extraction, and other forms of data mining utilized by Defendants to obtain creators' video content.

54. Plaintiff and Class Members suffered concrete and particularized economic injuries.

55. Defendants' conduct caused concrete harm to the market for Plaintiff's and Class Members' streams and videos. Instead of seeking to purchase copies of the audiovisual files from Plaintiff and members of the Class, Defendants chose to illegally capture, download and ingest creators' work product for free.

56. Plaintiff and Class Members also suffered injury in the loss of control of their works.

57. Plaintiff's and Class Members' loss of control over the audiovisual

files at issue here effectively undermines any ability to ensure that they are fairly compensated for exploitation of their work product. That is especially true here, where Defendants captured their audiovisual files and likely retained copies of them.

58. Despite this Plaintiff and the Class have no visibility into how and for what purpose Defendants continue to exploit their content, captured without consent, without any compensation to the creators.

59. As a direct and proximate result of Defendants' actions, Plaintiff has suffered actual damages, including loss of control over his work product and impairment of its market value.

**D. <u>How Twitch Transmits Live Streams and Chat</u>**

60. A Twitch livestream is an electronic communication consisting of images, sounds, and data transmitted through an electronic communications system. When a creator broadcasts, the creator's broadcasting software or hardware transmits an audiovisual signal through the Internet to a designated Twitch server.[15] Twitch then "perform[s] real-time processing, like video transcoding on these streams" and "provide[s] a high throughput control plane for making them available for world-wide distribution at scale."[16]

61. Twitch chat is likewise a real-time messaging system. According to Twitch's own developer documentation, "[c]hat is an essential part of the Twitch experience, allowing community members, streamers, chatbots to interact with each

---

[15] *Video Broadcasting Overview*, Twitch Developers (explaining that creators capture a video signal from games and cameras and send it "through the open Internet, into Twitch using *Real-Time Message Protocol (RTMP)*"), https://dev.twitch.tv/docs/video-broadcast/ (last visited Aug. 20, 2026).

[16] Roth Puri, Christopher Lafata, Kevin Pan & Eric Kwong, *Ingesting Live Video Streams at Global Scale*, Twitch Blog (Apr. 26, 2022), https://blog.twitch.tv/en/2022/04/26/ingesting-live-video-streams-at-global-scale/.

other in real time."[17] Twitch chat operates over "Twitch IRC," a chat interface.[18]

62. Every chat message travels from the sender's device to Twitch's chat servers, which relay the message in real time to every client connected to that channel's chat room. Each chat message accordingly exists as a communication in transit over Twitch's network at the moment Twitch's systems receive, handle, and deliver it.

63. Live streams and stream chats are communications exchanged between and among creators and their viewers; Twitch operates the network over which those communications travel. Defendant Amazon is a legal entity separate and distinct from Twitch and is not a party to the communications exchanged between creators and viewers on the Twitch platform.

64. As alleged above, creators can restrict access to their streams, including by setting their channels to subscriber-only mode. Twitch likewise offers followers-only and subscribers-only chat modes that restrict who may participate in a channel's chat. Communications transmitted through these restricted modes are not configured to be readily accessible to the general public.

### E. The "Training for Generative AI" Program Captures Streams and Chat Without Notice or the Consent of All Parties

65. On August 12, 2026, Twitch's official support account announced: "We've added a setting that lets you opt out of having your channel content used to train generative AI content models across Amazon," linking an accompanying help article.[19]

---

[17] Twitch Developers, *Getting Started with Chat & Chatbots*, https://dev.twitch.tv/docs/irc/get-started/ (last visited Aug. 19, 2026).

[18] Twitch Developers, *Twitch IRC*, https://dev.twitch.tv/docs/chat/irc/ (last visited Aug. 19, 2026).

[19] Twitch Support (@TwitchSupport), X (Aug. 12, 2026, 12:12 PM EST), https://x.com/TwitchSupport/status/2087572924450455558 (linking Twitch help article, *Twitch Account Settings: Training for Generative AI*, https://help.twitch.tv).

66. Twitch's support documentation states that the content eligible for Amazon's generative AI training includes a channel's "streams, VODs, clips, stream chats, and pictures and text on your channel," which may be used in "future training of a model developed by Amazon whose purpose is to generate or synthesize text, audio, images, or video."[20]

67. Twitch's FAQ offers, as an example of the program's operation, that a creator's "audio might help refine models that create speech to text, which would help improve captions at Twitch but would also help improve captions across Amazon."[21] Defendants have confirmed that the resulting models may be deployed across Amazon's businesses generally, and not merely at Twitch.[22]

68. Public reporting describes the categories of content Defendants collect under the program as including "live broadcasts" as a category separate and distinct from recorded videos, and clips.[23] On information and belief, Defendants' acquisition of live broadcasts and stream chats occurs in real time, contemporaneously with the transmission of those communications between creators and viewers, while the communications are in transit over Twitch's network.

69. The "Training for Generative AI" setting is channel-scoped, not person-scoped. Twitch's help documentation states: "If you chat on someone else's stream, their opt-out preferences govern if that chat can be used for training."[24] A person's own opt-out therefore does not prevent Defendants from capturing and

---

[20] Twitch, *Twitch Account Settings: Training for Generative AI*, https://help.twitch.tv/s/article/twitch-account-settings?language=en_US#FAQ.
[21] *Id*.
[22] The Register, *Twitch feeds your streams to Amazon's AI unless you tell it to stop* (Aug. 13, 2026), https://www.theregister.com/offbeat/2026/08/13/twitch-feeds-your-streams-to-amazons-ai-unless-you-tell-it-to-stop/5287258.
[23] *See* The American Bazaar, *supra* note 6.
[24] Twitch, *supra* note 20.

using that person's chat messages whenever that person chats in another channel, and a channel owner's default setting purports to authorize Amazon's capture of chat messages written by participants who never consented and whose own preferences are disregarded. By design, Defendants never obtain—and their systems are incapable of obtaining—the consent of all parties to the communications they capture.

70. Defendants provided no advance notice of the program. Twitch sent no email, displayed no pop-up notification, and made no announcement before enabling the setting for every account. The setting was instead discovered by a reporter, Zach Bussey.[25]

71. Users have further reported that the opt-out toggle has reverted to the enabled position after being switched off.[26]

72. The August 2026 disclosure was itself years late. In 2024, Mike Minton—then Twitch's Chief Monetization Officer—acknowledged at an event hosted by The Information that Twitch content was already being used for Amazon AI development "in a prototyping, not in any kind of production scale, capacity." That use was never disclosed to creators, and no opt-out mechanism of any kind existed at the time.[27]

---

[25] Hacks Technology News, *Twitch Adds Opt-Out for Amazon AI Training After Enrolling All Creators by Default* (Aug. 14, 2026), https://www.ghacks.net/2026/08/14/twitch-adds-opt-out-for-amazon-ai-training-after-enrolling-all-creators-by-default/.

[26] GeekWire, *Amazon's Twitch is using livestreams to train its generative AI, and nobody's happy with it* (Aug. 15, 2026), https://www.geekwire.com/2026/amazons-twitch-is-using-livestreams-to-train-its-generative-ai-and-nobodys-happy-with-it/.

[27] Tech Times, *Twitch Streams Feed Amazon AI by Default; Opt Out or Your Content Is Already Used* (Aug. 13, 2026), https://www.techtimes.com/articles/324235/20260813/twitch-streams-feed-amazon-ai-default-opt-out-your-content-already-used.htm (reporting Mr. Minton's 2024 statements at an event hosted by The Information, as reported by 404 Media).

73. Nor was the 2024 acknowledgment equivocal. Asked at The Information's event whether Amazon uses Twitch to train AI models, Mr. Minton answered: "Yeah, for sure." He continued: "I mean, I think obviously within the bounds of user trust within the bounds of privacy regulations, which vary all around the world, but of course we have a role to play in that."[28]

74. Those remarks establish that Defendants understood, no later than 2024, that their use of Twitch content for AI training was constrained by "privacy regulations" and by "user trust"—and that Defendants proceeded anyway, for more than two additional years, without disclosing the practice to creators, without amending the Privacy Notice or the Terms of Service to reflect it, and without obtaining anyone's consent. Defendants' conduct after that acknowledgment was knowing and willful. The assurance itself proved hollow: a program genuinely conducted "within the bounds of user trust" is not one that must be enabled silently and by default because, as Mr. Minton later admitted, "[i]f it was opt-in, nobody would opt in."

75. Amazon captured, read, learned, and used the contents of Plaintiff's and Class Members' communications—their live streams and stream chats—for Amazon's own commercial purposes, including the development, improvement, and commercialization of Amazon's AI Products, and not for the purpose of providing any service to the communicating parties.

76. Twitch intentionally designed, configured, maintained, and operated the systems that captured Plaintiff's and Class Members' communications and routed them to Amazon, and did so pursuant to commercial arrangements and coordinated planning between Twitch and Amazon.

---

[28] Ars Technica, *Twitch Content Has Trained Amazon AI for Years, but Users Can Opt Out Now* (Aug. 2026), https://arstechnica.com/ai/2026/08/twitch-content-has-trained-amazon-ai-for-years-but-users-can-opt-out-now/.

### F. The Governing Contract Documents and Defendants' Launch-Day Amendments

77. Use of the Twitch platform is governed by Twitch's Terms of Service, a standard-form contract drafted by Twitch, which directs users to the Twitch Privacy Notice "for information relating to how we collect, use, and disclose your personal information." The Terms of Service define "Twitch" to mean Twitch Interactive, Inc. "collectively with its affiliates."[29]

78. In Section 19(e) of the Terms of Service, Twitch selected California law and California courts for all disputes with its users, nationwide: "You agree that any dispute, claim, or cause of action of any sort that might arise between the parties will be governed by this Agreement and the laws of the State of California and applicable United States federal law," and all such disputes "shall be brought and resolved exclusively by the United States District Court for the Northern District of California or a California state court located in San Francisco County, California."[30]

79. Throughout the period of the conduct alleged herein—from at least October 27, 2023 through August 11, 2026—Section 8(a)(i) of the operative Terms of Service granted Twitch and its sub-licensees a license to use, reproduce, modify, adapt, and create derivative works from User Content, subject to an express statement of the grant's purpose: "Twitch can exercise these rights in connection with monetizing the Twitch Services."[31]

80. Section 8(a) of the Terms of Service further provided that, "[w]ith

---

[29] Twitch, *Terms of Service* §§ 1, 3 (last modified Aug. 12, 2026), https://legal.twitch.com/en/legal/terms-of-service/; Twitch, *Privacy Notice* (last modified Aug. 12, 2026), https://legal.twitch.com/en/legal/privacy-notice/.

[30] Twitch, *Terms of Service*, *supra* note 29, § 19(e).

[31] Twitch, *Terms of Service* § 8(a)(i) (last modified Oct. 27, 2023), https://legal.twitch.com/en/legal/terms-of-service/20232710/. Where available, prior versions of the Terms of Service and Privacy Notice have been independently verified in the Internet Archive's Wayback Machine, https://web.archive.org/.

respect to streaming live and pre-recorded audio-visual works, the rights granted by you hereunder terminate once you delete such User Content from the Twitch Services, or generally by closing your account," subject only to certain enumerated exceptions. The training of generative AI models is not among the enumerated uses that survive deletion or account closure.[32]

81. On August 12, 2026—the same day the "Training for Generative AI" setting was launched—Twitch amended the Terms of Service. Among other changes, Twitch rewrote the purpose sentence of the Section 8(a)(i) license, replacing "Twitch can exercise these rights in connection with monetizing the Twitch Services" with "Twitch can exercise these rights in connection with Twitch and/or its affiliates' business."[33]

82. The same August 12 amendment added an entirely new recital to Section 8, providing that "[b]y live streaming or otherwise making User Content available on Twitch, you are directing Twitch to also cache and/or store your User Content and every individual piece of it (such as each video clip, audio segment, image, or text)" and "directing Twitch to use any automated tools enabled on your account to generate and store additional content for you."[34] No comparable language appeared in any prior version.

83. The August 12 amendments are themselves evidence that the Terms of Service in effect during the relevant period did not convey the rights Defendants exercised. Had the operative license already authorized the use of creators' content for Amazon's generative AI business, no amendment expanding the grant's purpose from "monetizing the Twitch Services" to "Twitch and/or its affiliates' business,"

---

[32] *Id.* § 8(a)(iii); *Terms of Service* § 8(a)(v) (last modified Dec. 8, 2025) https://legal.twitch.com/en/legal/terms-of-service/20250812/.

[33] *Compare* Twitch, *Terms of Service*, *supra* note 31, § 8(a)(i), *with* Twitch, *Terms of Service* (last modified Aug. 12, 2026), *supra* note 29, § 8(a)(i).

[34] Twitch, *Terms of Service* (last modified Aug. 12, 2026), *supra* note 29, § 8.

and no newly minted recital of user "direction," would have been necessary. On information and belief, the amendments were made in anticipation of disputes concerning the program. So too the opt-out toggle itself: an "irrevocable" license that already conveyed the right to train AI models would render an opt-out option meaningless.

84. Meanwhile, Twitch's Terms of Service categorically forbid users from engaging in the very conduct Defendants engaged in at scale. Section 7 prohibits "use of any data mining, robots, or similar data gathering or extraction methods" and "downloading (except page caching) of any portion of the Twitch Services, the Materials, or any information contained in them," and Section 10 prohibits accessing any Twitch resource "by means of any robot, spider, scraper, crawler, or other automated means for any purpose." Creators reasonably understood from Twitch's own contract that bulk copying and extraction of platform content was impermissible.[35]

85. The Twitch Privacy Notice tells the same story. The version in effect immediately before the program's disclosure, last modified January 15, 2026, enumerated the uses to which Twitch put user information—operating and developing the Twitch Services, providing security, managing account relationships, recommending content and advertising, enabling participation features, preventing fraud and abuse, and "understand[ing] the usage trends of our users." No enumerated use disclosed the training of artificial intelligence or generative AI models.[36]

86. On August 12, 2026—again, the day of the launch—Twitch amended

[35] Twitch, *Terms of Service* (last modified Aug. 12, 2026), *supra* note 29, §§ 7, 10(xi).

[36] Twitch, *Privacy Notice* § 2 How Twitch Uses Personal Information (last modified Jan. 15, 2026), https://legal.twitch.com/en/legal/privacy-notice/20261501/.

the Privacy Notice to add, for the first time, that Twitch uses information "to test and improve technology, including machine learning and artificial intelligence, to support and enhance the customer experience across our products and services," and that "[t]his includes using data to develop or deploy our generative AI models and services," with a link to Amazon's "Generative AI Development Disclosure."[37]

87. Counsel's review of the Privacy Notice's link to Amazon's "Generative AI Development Disclosure" on August 20, 2026 confirmed that the link is broken, and the following message appears when the link is clicked:




88. In any event, both the pre- and post-amendment Privacy Notices contain two commitments Twitch made to its users. First, a non-retroactivity covenant: "We will not materially change our policies and practices to make them less protective of personal information collected in the past under a prior version of

[37] Twitch, *Privacy Notice*, *supra* note 29, § 2 How Twitch Uses Personal Information (linking Amazon, *Generative AI Development Disclosure*, https://www.amazon.com/gp/help/customer/display.html?nodeId=TmGoGN3UbFaQ1CAph7).

the Privacy Notice without the consent of affected individuals." Second, an advance-notice promise: "Other than as set out in this Privacy Notice, you will receive notice when personal information about you might be shared with third parties and you will have an opportunity to choose not to share the information."[38]

89. Twitch broke both of its promises. It promised that if it ever changed the rules in a way that gave users' old information less protection, it would ask permission first—but instead, it took everything users had uploaded over the years and fed it into AI training without asking anyone. Then, it quietly flipped the AI training switch to "on" for every account, without informing users, and therefore without obtaining their consent. And Twitch's second promise, to warn people before sharing their information and give them a chance to say no, was also broken: Twitch provided no warning, and by the time anyone could say no, the sharing had already happened.

90. Nor did the Privacy Notice's general statement that information shared with affiliates "may be used by both Twitch and Amazon to operate, provide, develop, and improve Amazon's and Twitch's products and services" disclose the conduct at issue. That boilerplate language addresses the handling of users' personal information; no reasonable user would understand it to authorize the wholesale copying of creators' original audiovisual works and private communications into training corpora for commercial generative AI models sold to third parties. Defendants' own August 12 amendments to both the Terms of Service and the Privacy Notice—adding express generative-AI language that would have been unnecessary surplusage if the prior text already covered it—confirm as much.

91. Twitch intentionally designed, configured, maintained, and operated

[38] Twitch, *Privacy Notice*, *supra* note 29, § 15 Changes and Updates to This Privacy Notice, § 3 When Twitch Discloses Personal Information; Twitch, *Privacy Notice* (last modified Jan. 15, 2026), *supra* note 36 (same).

the systems that captured Plaintiff's and Class Members' communications and routed them to Amazon, and did so pursuant to commercial arrangements and coordinated planning between Twitch and Amazon.

**G. <u>Plaintiff's Experience</u>**

92. Plaintiff Pandiscia is a citizen of the State of Connecticut. At all times relevant to this action, Plaintiff resided in Fairfield County, Connecticut.

93. Plaintiff has been a frequent and regular Twitch content creator for close to ten years, with over 900 followers on his channel.

94. In the course of creating content on Twitch, Plaintiff has streamed over 1,000 hours of content.

95. Plaintiff has invested substantial time and money into bringing awareness around his content, including tens of thousands of dollars in equipment, props, and subscriptions used in connection with his streams. For instance, Plaintiff has streamed footage of his building LEGO sets and playing videogames. Without guarantee of success, Plaintiff has incurred substantial time and monetary expense for the sole purpose of bettering his viewers' experience.

96. Plaintiff derives value from his Twitch channel via viewership and related monetization.

97. Plaintiff had no reason to believe that Defendants would be using his content to train their generative AI products and Plaintiff is opposed to such use of his original content.

98. In fact, once Plaintiff found out about the opt-out option rolled out by Twitch earlier this week, he has changed his Twitch account settings to stop Defendants from using his content to train AI.

99. Plaintiff maintained his Twitch account, and created and streamed his content, subject to Twitch's Terms of Service and Privacy Notice. Had Defendants disclosed that content and communications on the platform would be captured and

used to train Amazon's generative AI products, Plaintiff would have opted out immediately—as he in fact did as soon as he learned of the setting—and would not have made his content and communications available on the same terms.

100. Plaintiff lost money and property as a result of Defendants' conduct: his original audiovisual works, communications, and associated data are property; Defendants took and monetized them without compensation, diminishing their value, depriving Plaintiff of the compensation an existing licensing market places on content of this kind, and depriving him of control over his works and communications.

## CHOICE OF LAW ALLEGATIONS

101. California's substantive law may be applied to Plaintiff and every Class member without offending the Due Process Clause (U.S. Const. amend. XIV, § 1) or the Full Faith and Credit Clause (U.S. Const. art. IV, § 1). California has extensive contacts—and, indeed, is the center of gravity—for the conduct challenged in this action, giving the State a paramount interest in having its law govern and ensuring the choice of California law is neither arbitrary nor unfair.

102. Twitch is incorporated under California law and maintains its principal place of business in San Francisco, California. From that headquarters Twitch directs the operation of its website and the content capturing that give rise to Plaintiff's claims. These deliberate California contacts are more than sufficient to make application of California law constitutionally permissible.

103. The servers, compliance staff, and information-technology teams that configure the challenged practices are based principally in California. Accordingly, the wrongful interceptions and disclosures alleged herein emanated from within California's borders—even when a content creator accessed Twitch's site from another state.

104. California's choice-of-law rules likewise point to California. Under

California's "most significant relationship" test, the place where the tortious conduct occurred and where Defendant Twitch is headquartered carry particular weight. Both factors favor application of California law to the nationwide class.

105. Because Defendants purposely availed themselves of California law, and because the gravamen of Plaintiff's claims arises from decisions and conduct centered in California, California has a far greater interest in regulating this conduct than any other jurisdiction. California law therefore governs the claims of all Class members.

106. Application of California law is also what Defendants themselves bargained for. Section 19(e) of the Terms of Service provides that "any dispute, claim, or cause of action of any sort that might arise between the parties will be governed by this Agreement and the laws of the State of California and applicable United States federal law," and requires that such disputes be brought exclusively in this District or in San Francisco County. Having selected California law to govern every dispute with every user nationwide, Defendants cannot be heard to object to the application of California law, including the California Invasion of Privacy Act, to the claims of Plaintiff and the Class.

## **TOLLING**

107. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that his Twitch content was intercepted and used to train AI because Defendants kept this information secret.

## **CLASS ALLEGATIONS**

108. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Nationwide Class:

> All content creators who used the Twitch platform at twitch.tv and whose content was used to train Amazon's AI products without consent.

109. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

110. *Numerosity*. The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of millions of individuals, and the members can be identified through Defendants' records.

111. *Predominant Common Questions*. The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a. Whether Defendants breached an implied contract with Plaintiff and Class members;

b. Whether Defendants breached express contractual commitments in the Terms of Service and the Privacy Notice, including the covenant not to apply materially less-protective practices to past-collected information without consent, the promise of advance notice and an opportunity to decline third-party sharing, and the scope and termination limits of the Section 8 content license;

c. Whether Defendants' conduct constitutes unlawful, unfair, or fraudulent business acts or practices within the meaning of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, and whether

Plaintiff and Class members lost money or property as a result;

d. Whether Defendants were unjustly enriched;

e. Whether Plaintiff and the Class are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement; and,

f. Whether Plaintiff and the Class are entitled to actual, statutory, punitive and/or other forms of damages, and other monetary relief.

112. *Typicality*. Plaintiff's claims are typical of the claims of the other members of the Class, and these claims arise from the same conduct by Defendants and are based on the same legal theories.

113. *Adequate Representation*. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the Class.

114. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

115. Plaintiff may revise the foregoing class allegations and definitions

based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**FIRST CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT AND OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
***(On behalf of Plaintiff & the Class against Defendant Twitch)***

116. Plaintiff re-alleges and incorporates paragraphs 1 through 115 with the same force and effect as if fully restated herein.

117. Plaintiff and Class Members are content creators with Twitch channels who uploaded and streamed original audiovisual work product through the Twitch platform.

118. Twitch streamers earn a portion of the subscription fees paid by their viewers, ads shown during their streams, and revenue from viewers who purchase "bits" to "cheer" during streams – with the remainder going to Twitch.

119. By utilizing the Twitch platform—creating accounts, streaming original audiovisual works, and participating in Twitch's revenue-sharing programs—Plaintiff and Class members each respectively entered into an implied-in-fact contract with Defendant Twitch, the terms of which are implied from the parties' conduct, their course of dealing, and the circumstances of the relationship alleged herein.

120. The implied terms of those contracts included, among others: (a) that Twitch would use creators' content only within the scope of the parties' disclosed relationship—operating, promoting, and monetizing the Twitch Services, with creators receiving their agreed share of the resulting revenue; (b) that creators' content would not be copied at scale for undisclosed commercial exploitation outside that relationship, consistent with Twitch's own contractual prohibitions on data mining, bulk downloading, and automated extraction of platform content; and (c) that rights in streaming live and pre-recorded audio-visual works would end

upon deletion or account closure, as Twitch's own operative terms provided.

121. Every contract governed by California law also contains an implied covenant of good faith and fair dealing, which prohibits each party from doing anything that injures the right of the other to receive the benefits of the agreement and constrains any exercise of contractual discretion. The parties' implied covenant forbade Twitch from wielding a license granted in the context of a content-distribution and revenue-sharing relationship to convey creators' entire body of work to its parent company as free training stock for separate commercial AI products—a use no creator contemplated, that was concealed while it occurred, and that Twitch's own executives acknowledged users would never have approved if asked.

122. To the extent Defendant Amazon claims rights in Plaintiff's and Class Members' content as Twitch's affiliate or sub-licensee, Amazon took any such rights subject to the same limitations, and is bound by the scope, purpose, and termination provisions of the contracts under which it claims—including Twitch's own contractual prohibitions on data mining, bulk downloading, and automated extraction of platform content.

123. Plaintiff and Class members would not have submitted their original work product to Twitch had they known that Defendant had no intention of keeping this implied contract.

124. Defendant breached its implied contracts with Plaintiff and the Class Members, and the implied covenant of good faith and fair dealing, by capturing their original work product and using it to train Amazon's AI products, without authorization; by exploiting creators' content outside the scope and purpose of the parties' relationship and without any share of the resulting value; and by exercising its contractual discretion in bad faith—enrolling every creator by default, concealing the program while it operated, and thereby frustrating creators' right to

receive the benefits of the relationship. The revenue share creators received compensated the disclosed uses of their content within the Twitch Services; it did not and does not compensate the undisclosed conveyance of their works into Amazon's training corpora.

125. As a direct and proximate result of Twitch's breaches, Plaintiff and Class members sustained actual losses and damages as described in detail above, including that they did not get the benefit of their bargain.

126. Plaintiff and Class members request all forms of damages with respect to these breaches of implied contract, including nominal damages.

**SECOND CAUSE OF ACTION**
**UNJUST ENRICHMENT/QUASI CONTRACT/RESTITUTION**
***(On behalf of Plaintiff & the Class against both Defendants)***

127. Plaintiff re-alleges and incorporates paragraphs 1 through 115 with the same force and effect as if fully restated herein.

128. This cause of action is pled in the alternative to the breach of implied contract cause of action.

129. Defendants received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense. Specifically, Plaintiff conferred a direct economic benefit on Defendants by providing original content on twitch.tv. Embedded in that transaction was an implicit commitment that this original content would be handled in accordance with applicable law and would not be used for commercial gain without authorization. Plaintiff did not receive the benefit of that commitment. Defendants captured Plaintiff's content and monetized it by feeding it to train Amazon generative AI, from which Amazon derives a significant revenue stream.

130. Defendants received benefits from Plaintiff and Class members in the form of the Plaintiff's highly valuable original content, that Defendants wrongfully intercepted from Plaintiff and Class members without authorization and proper

compensation.

131. Defendants intercepted, stored, and used this data for their own gain, providing Defendants with economic, intangible, and other benefits, including highly valuable data for training and improvement of its AI products and algorithms.

132. The benefit Defendants obtained is concrete and measurable. A commercial market exists in which developers of AI systems pay content platforms and rights holders substantial sums to license content for model training: Google, for example, is reported to have negotiated a $60 million per year fee to Reddit for the right to train its AI models on Reddit users' posts, and Reddit has reported more than $200 million in AI data-licensing revenue, including a comparable arrangement with OpenAI.[39] By taking Plaintiff's and Class Members' audiovisual works and communications without any license or negotiation, Defendants obtained for free what participants in that market pay tens of millions of dollars per year or more to acquire, and avoided the acquisition costs that their competitors bear—savings and benefits that Defendants have retained.

133. Defendants' retention of these benefits is unjust in light of the circumstances alleged herein: Defendants took the content without notice or consent; concealed the program from at least 2024 until August 12, 2026; enrolled every creator by default precisely because, in their own executive's words, "[i]f it was opt-in, nobody would opt in"; and amended their governing documents on the day of disclosure in an effort to supply after the fact the authorization they never

[39] Anna Tong, Echo Wang & Martin Coulter, Yahoo!tech, *Exclusive—Reddit in AI Content Licensing Deal with Google, Sources Say* (Feb. 21, 2024), https://tech.yahoo.com/ai/articles/exclusive-reddit-ai-content-licensing-041012503.html; Joel Baglole, TipRanks, *Reddit (RDDT) Seeks New AI Content Deal with Google* (2026), https://www.tipranks.com/news/reddit-rddt-seeks-new-ai-content-deal-with-google.

obtained. Under principles of restitution and unjust enrichment, Plaintiff and Class Members are entitled to disgorgement of the profits, avoided costs, and other benefits attributable to Defendants' use of their content, whether or not each Class Member can prove a corresponding out-of-pocket loss.

134. Had Plaintiff known of Defendants' misconduct, he would not have provided any of his valuable content to Defendants or have used the Twitch platform.

135. Defendants unjustly retained these benefits at the expense of Plaintiff and Class members because Defendants' conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

136. The benefits that Defendants derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles in every state for Defendant to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

137. Defendants should be compelled to disgorge profits into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
***(On behalf of Plaintiff & the Class against both Defendants)***

138. Plaintiff re-alleges and incorporates paragraphs 1 through 115 with the same force and effect as if fully restated herein.

139. Plaintiff and Class Members entered into express contracts with Twitch—defined in the Terms of Service to include its affiliates—the terms of which are set forth in the Terms of Service and the Privacy Notice that the Terms

of Service reference and incorporate.

140. The material terms of those contracts during the relevant period included: (a) the Section 8(a)(i) license, whose stated purpose was the exercise of rights "in connection with monetizing the Twitch Services"; (b) the Privacy Notice's covenant that Twitch "will not materially change our policies and practices to make them less protective of personal information collected in the past under a prior version of the Privacy Notice without the consent of affected individuals"; and (c) the Privacy Notice's promise that, other than as set out therein, users "will receive notice when personal information about you might be shared with third parties" and "will have an opportunity to choose not to share the information."

141. Plaintiff and Class Members performed their obligations under these contracts by creating and streaming original content on the Twitch platform, abiding by the Terms of Service, and providing the information and content contemplated by the parties' agreement.

142. Defendants materially breached these express terms in at least the following respects. First, Defendants exercised the Section 8 license for a purpose outside its stated scope, exploiting Plaintiff's and Class Members' content not "in connection with monetizing the Twitch Services" but to build, improve, and commercialize Amazon's separate generative AI products, including models sold through Amazon Bedrock.

143. Second, Defendants breached the Privacy Notice's non-retroactivity covenant by applying a materially less-protective practice—generative AI training—to content, communications, and information collected in the past under prior versions of the Privacy Notice, without the consent of affected individuals.

144. Third, Defendants breached the Privacy Notice's advance-notice promise by providing no notice and no opportunity to decline before subjecting Plaintiff's and Class Members' information and communications to the program,

which was enabled silently, by default, and disclosed only after the fact.

145. Plaintiff and Class Members would not have created and streamed content on the Twitch platform, or would have done so on different terms, had they known Defendants did not intend to honor these express commitments.

146. As a direct and proximate result of Defendants' breaches, Plaintiff and Class Members sustained damages, including the loss of the benefit of their bargain, the diminution in value of their original works and personal information, and the loss of control over their content and communications, as alleged above.

147. Plaintiff and Class Members seek all available contract damages, including actual, compensatory, consequential, and nominal damages, together with such other relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.**
***(On behalf of Plaintiff & the Class against both Defendants)***

148. Plaintiff re-alleges and incorporates paragraphs 1 through 115 with the same force and effect as if fully restated herein.

149. California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each of the UCL's three prongs provides an independent basis for liability.

150. Each Defendant is a "person" within the meaning of Cal. Bus. & Prof. Code § 17201. The conduct alleged herein—operating the Twitch platform; capturing, ingesting, disclosing, and using creators' content and communications; and developing, training, and commercializing Amazon's AI Products through Amazon Bedrock and related offerings—constitutes business acts and practices undertaken in the course of Defendants' commercial operations.

151. Plaintiff and Class Members lost money or property as a result of Defendants' unlawful, unfair, and fraudulent practices. Their original audiovisual

works, communications, and associated data are property in which they hold a vested interest. Defendants took that property without compensation; diminished its value, including its licensing and market value in the existing commercial market for AI training content; deprived Plaintiff and Class Members of the compensation that market places on such content; and deprived them of control over their works and communications, including works whose license rights had terminated upon deletion or account closure.

152. Defendants' practices are unlawful because they violate, among other laws, the California Invasion of Privacy Act, Cal. Penal Code § 631; Plaintiffs' contractual rights; and the right of privacy guaranteed by Article I, Section 1 of the California Constitution, as alleged herein. Each violation independently renders Defendants' practices unlawful under the UCL.

153. Defendants' practices are unfair within the meaning of the UCL. The practices—secretly capturing creators' works and communications for undisclosed commercial AI training beginning no later than 2024; enrolling every creator by default upon disclosure because, in Defendants' own words, "[i]f it was opt-in, nobody would opt in"; structuring consent so that chat participants' own preferences are never solicited or honored; deploying an opt-out that users report reverting to the enabled position; and amending the governing documents on the day of disclosure to supply after the fact the authorization never obtained—offend established public policies, including the legislative policies embodied in Cal. Penal Code §§ 630-631 and Article I, Section 1 of the California Constitution, and are immoral, unethical, oppressive, and unscrupulous.

154. The gravity of the harm to Plaintiff and Class Members—the uncompensated and irreversible taking of their works and private communications, and the loss of control over both—outweighs any conceivable utility of Defendants' conduct. Feasible, lawful alternatives existed and exist: Defendants could have

sought informed, opt-in consent, or paid for training content at market rates, as participants in the AI training-data licensing market do. Defendants rejected those alternatives for the admitted reason that consent would not be given. The resulting injury is substantial, affecting millions of creators; it was not reasonably avoidable by Plaintiff or Class Members, from whom the practice was concealed and to whom no notice was given; and it is not outweighed by any countervailing benefit to consumers or competition.

155. Defendants' practices were likely to deceive, and did deceive, reasonable members of the public. Defendants made partial representations and material omissions, including: (a) every version of the Privacy Notice in effect through August 11, 2026, which enumerated the uses to which user information would be put while omitting generative AI training; (b) Section 8 of the operative Terms of Service, which represented that the content license would be exercised "in connection with monetizing the Twitch Services"; (c) the 2024 public assurance that any AI-related use remained "within the bounds of user trust" and "within the bounds of privacy regulations," made while the undisclosed program was underway; and (d) the silent, default enrollment of every channel. Defendants had exclusive knowledge of the material facts, actively concealed them, and made partial representations that were misleading absent disclosure of the whole truth, giving rise to a duty to disclose.

156. The omitted facts were material: Defendants' own executive admitted that, had creators been asked, "nobody would opt in." Plaintiff reasonably relied on Defendants' representations and omissions by maintaining his account and continuing to create and stream content without opting out—an option that did not exist—and, as alleged above, would have acted differently had the truth been disclosed, as he in fact did immediately upon learning of it. Reasonable creators and users would attach importance to the undisclosed facts in deciding whether and on

what terms to create, stream, and communicate on the platform.

157. As alleged in the Choice of Law Allegations, Defendants' practices were conceived, directed, and implemented from California, and Defendants themselves selected California law to govern all disputes with their users. The UCL accordingly applies to the claims of Plaintiff and the Class.

158. Plaintiff and Class Members lack an adequate remedy at law. Defendants' conduct is ongoing, and the ingestion of content into training corpora and models is, by the operation of Defendants' own systems, permanent and irreversible; no award of damages can restore control over the works and communications already taken or halt the continued capture and exploitation of new ones. Injunctive relief is the only remedy that addresses Defendants' future conduct. In addition, and in the alternative, restitution is sought to the extent that legal remedies under the other causes of action are unavailable, uncertain, or do not reach the same conduct, time periods, or class members, including by reason of Defendants' anticipated reliance on contractual limitation-of-claims and limitation-of-liability defenses.

159. Plaintiff, on behalf of himself and the Class, seeks restitution of the value of the money and property Defendants acquired from Plaintiff and Class Members by means of the practices alleged herein, in which Plaintiff and Class Members retain a vested interest.

160. Plaintiff further seeks injunctive relief, including public injunctive relief for the benefit of the general public of platform creators and users, ordering Defendants to: cease capturing, disclosing, and using creators' content and communications for generative AI training absent express, informed, person-scoped consent, including as to chat participants; implement an effective and durable opt-out; identify, segregate, and delete content, communications, and data unlawfully obtained, and cease using training corpora and models to the extent derived from

such material; and make corrective disclosure.

161. Plaintiff also seeks reasonable attorneys' fees and costs, including under California Code of Civil Procedure § 1021.5, and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully request that the Court enter an order:

A. Certifying the Class and appointing Plaintiff as Class representative;

B. Finding that Defendants' conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against Defendants;

D. Awarding such injunctive and other equitable relief as the Court deems just and proper, including injunctive relief;

E. Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F. Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

G. Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems just and proper.

DATED: August 20, 2026

Respectfully submitted,

*<u>/s/ Victor J. Sandoval</u>*

Victor J. Sandoval (SBN 344461)
Elena A. Belov*
**ALMEIDA LAW GROUP LLC**
3415 S Sepulveda Suite 1121
Los Angeles, CA 90034

T: 562-534-5907
*victor@almeidalawgroup.com*
*elena@almeidalawgroup.com*

Arturo Peña Miranda (SBN 325108)
Jennifer S. Czeisler*
Edward W. Ciolko*
**STERLINGTON, PLLC**
228 Park Avenue South, No. 97956
New York, New York 10003
Tel.: 407-259-0234
*arturo.pena@sterlingtonlaw.com*
*jen.czeisler@sterlingtonlaw.com*
*edward.ciolko@sterlingtonlaw.com*

**Pro Hac Vice* forthcoming

*Attorneys for Plaintiff and the Proposed Class*